## THE FIRST NATIONAL BANK OF MORRISON
### v.
## BENJAMIN BRESSLER, ADMINISTRATOR.

*Administration—Trover for Notes Deposited as Collateral by Son of Intestate—Presumption as to Son's Authority to Indorse—Competency of Witness—Interest of Maker of Notes in Event of Suit.*

1. In an action of trover brought by the administrator of an estate to recover the value of notes alleged to have been the property of the intestate, but which had been pledged by a son of intestate to the appellant bank as collateral for his debt, where it appeared that the indorsement of the notes was in the son's handwriting, the burden of proof was on the bank to show that the son had authority to sign his father's name upon the notes, the fact that otherwise a crime would have been committed, not operating to change the presumption in this suit.

2. The fact that the son may have had general authority to transact business for his father, was not sufficient to show that he had authority to pledge his father's property as security for his own debts.

3. Where an alleged incompetent witness testified only to a fact that was conclusively proved by other witnesses, and was not disputed by the opposing side, his alleged incompetency is immaterial.

4. Where the liability of the maker over for certain payments of interest he had made upon the note in suit depended upon the event of the action, which was by an administrator, such maker is not a competent witness in his own favor and against the administrator, although he is not a party to the suit.

[Opinion filed December 8, 1890.]

APPEAL from the Circuit Court of Whiteside County; the Hon. John D. Crabtree, Judge, presiding.

Mr. J. D. Andrews, for appellant.

The gist of this action is the wrongful conversion. This, says Chitty, " is the tort or *maleficium,* and to entitle the plaintiff to recover, two things are necessary: First, property in the plaintiff; secondly, wrongful conversion by the defendant. 1 Chitty, Pl., *146.

The conversion " may be either, first, by wrongfully taking a personal chattel; secondly, by some other illegal assumption of ownership." Ib. *153.

The gist of the action, or, as it is put in Yelverton's Reports, " the point of the action is the conversion, which is a tort; consequently a *feme covert* might be sued with her husband in trover at common law." Draper v. Faulkes, Yelverton, 166.

But nowhere is the character of this action better explained than in the notes by the learned editor of the American edition of Yelverton's Reports, by Metcalf: "Conversion *ex vi termini* imports an unlawful act, which can not be justified any more than larceny or murder; * * * and it may be, first, by unlawful taking, or by some other illegal assumption of ownership, or by illegally using or misusing goods, or by wrongful detention of personal chattels." 1 Chitty, Pl., 153. "The declaration in trover must expressly aver that the defendant converted the goods; and this word has as definite and exclusive technical import as '*burglariter*' or '*murdravit*' in an indictment. No other phraseology nor any statement of facts will properly describe the tort complained of." Priestley v. White, Yelverton, 174, notes.

" The plaintiff must be prepared to prove that at the time of the alleged conversion, the title was in him." 1 Chitty, Pl., *148.

The defendant is charged with a tort.

The motion to exclude the evidence arose after the plaintiff had introduced the note, which showed on its face and in connection with the balance of the testimony that it was once the property of Abram Ulmer, and this, standing alone with the

demand and refusal, would have been evidence on account of the presumption of continuance of ownership, to have gone to the jury; but the plaintiff went further and proved the indorsement of the note, which is all the evidence required by the defendant in trover to destroy the evidential character of a demand and refusal, because it is only when demand and refusal is unqualified and unexplained that it is evidence of a conversion.  1 Chitty, Pl., *160.

The demand and refusal are no evidence if it appears there is no conversion.  1 Saunders' Reports, 47.

" Presumptions are nothing more than the weighing of probabilities, and deciding by the powers of common sense on which side the truth is."  Burrel on Circumstantial Evidence, 23; Best, J., Rex v. Burdett, 4 B. Ald. 95–124.

A distinguished writer on judicial evidence has not hesitated to lay down the broad proposition that " the rights of men must be determined by probability."  Burrel on Presumptive Evidence, page 81; citing Gilbert on Evidence, page 2.

Probability, in this sense of the basis of judgment on evidence, has been well defined to be a likelihood of a proposition or fact being true or false, from its conformity or repugnance to our general knowledge, observation and experience. Ibid., page 81.

This was stated on authority of Lord Mansfield, in the celebrated Douglass case.  See also, Beardstown v. Virginia, 76 Ill. 44.

" Positive proof is always required where, from the nature of the case, it appears it might have been had; but, next to positive proof, circumstantial evidence or the doctrine of presumption must take place; for when the fact itself can not be demonstratively evinced, that which comes nearest to proof of the fact is the proof of such circumstances, which either necessarily or usually attend such facts; and these are called presumptions, which are only to be relied upon till the contrary be actually proved."  3 Blackstone, 371.

This maxim, " that a presumption will stand good until the contrary is proven" (Bouvier's Law Dict., title Maxims),

points out the application and use, in the trial of causes, of these presumptions.

" There are certain presumptions which the law makes relative to particular things which throw the onus of proof very frequently on the party who, but for the presumptions, would be required to sustain it. This is the result of that maxim of our law:—' *Stabitur praesumptioni donec probetur in contrarium.*' And hence, in general, whenever the law presumes the affirmative it lies on the party who denies the fact to prove the negative." Starkie on Ev., *591.

" Again, on the same principle, where a person is required to do an act, the not doing of which would make him guilty of a criminal neglect of duty, it shall be intended that he has performed it." Broom's Legal Maxims, *731.

" The maxim of the law is, *Omnia praesumuntur solemniter esse acta donec probetur in contrarium*—everything is presumed to be rightly and duly performed until the contrary is shown." Ibid. 729.

" This presumption applies to the acts of private individuals." Ibid. 731.

" The law of England, as well as the civil law, presumes against fraud." Starkie on Ev., *755.

" Another fruitful subdivision of presumption from what is natural and usual, sanctioned both in the civil and common law, is the rule that every one governs himself by the rules of right reason and consequently acquits himself of his engagement and his duty. This rule extends to every man, both in his official and private character. Part 1, Cowen's & Hill's Notes to Phillips on Ev., 459; Bank of U. S. v. Dandridge, 12 Wheaton, 69.

That a negative may be involved is not a test as to which party has the burden of proof. Whether a party asserts a negative or affirmative is immaterial. Wharton on Ev., Secs. 354–356; Hyde v. Heath, 75 Ill. 381; Beardstown v. Virginia, 76 Ill. 44; 1 Greenleaf on Ev., Sec. 80; Starkie on Ev., side page 583.

The presumption in favor of innocence and against crime or fraud is so strong as to raise an inference of an independent

fact rendering the act in question legal.    Starkie on Ev., 757; 1 Greenleaf on Ev., Sec. 35.

" Honesty and right acting are always presumed in the absence of evidence to the contrary.    The law presumes in favor of innocence until the opposite is shown—will never infer evil intentions and dishonest purposes from  *  *  *  conduct which is susceptible of upholding intentions and purposes which are honest."    2 Thompson on Trial, Sec. 1938; Stewart v. Englest, 6 Ind. 176; Norton v. Cearney, 10 Wis. 443.

Messrs. J. & J. Dinsmoor, for appellee.

In speaking of the burden of proof in actions upon promissory notes by an indorsee, Greenleaf uses this language : ' If a strong suspicion of fraud is raised, the plaintiff will then be required to show under what circumstances and for what value he became the holder."    Vol. 2, Sec. 172.

The rule with regard to the burden of proof in the cause at bar must be the same as though the defendant (appellant) was, as assignee of these notes, seeking to recover from the maker the amount of principal and interest, and the defendant (maker of the notes) should show that they had been negotiated by fraud or at least introduce evidence tending to show this ; the burden would then be upon the plaintiff (bank) to show that its hands were clean.    Bissell v. Morgan, 11 Cush. 198.

When fraud has been shown in the negotiation of a promissory note, the burden is on the plaintiff to show that he is a *bona fide* holder of the note.    Smith v. Braine, 71 Eng. Com. Law 242; Berry v. Alderman, 78 Eng. Com. Law 95; Story on Promissory Notes, Sec. 195–196; Marion County v. Clark, 94 U. S. 278; Collins v. Gilbert, 94 U. S. 753.

Under the evidence developed for the defendant, counsel had two theories to present and urge upon the attention of the jury; one was, that Hiram C. Ulmer wrote his father's name on the back of these notes in the course of a general agency in and about conducting his father's business; the second theory was, that the father had given all his property to his son.

This case is quite like Fenn et al. v. Harrison, 3 Durnford & East, 757, where " A " was employed by " B " (defendant), to whom a bill of exchange had come by indorsement to get said bill discounted, and told "to carry it to market and get cash for it, but that they (defendant) would not indorse it." The agent, however, contrary to his instructions, did indorse the bill. In an action "B " (principal) was held not liable, Ashhurst, J., observing: " If " A " had been the general agent of " B " I admit that they ("B") would be chargeable with his ("A") acts, but it appears, from the evidence, that he was constituted their particular agent with a circumscribed authority."

Buller, J., says: "I agree with my brother Ashhurst. " An agent constituted so for a particular purpose and under a limited and circumscribed power can not bind the principal by any act in which he exceeds his authority, for that would be to say that one man may bind another against his consent."

To take a hypothetical case, suppose the First National Bank (defendant) had known Abram Ulmer as a banker or otherwise engaged in business at Coleta, and without any prior connection with said business, so far as known to the public, Hiram C. Ulmer had been sent with the notes in controversy to said bank to raise money in and about the known business of said Abram by a pledge of the notes, but with specific directions not to indorse them, and, contrary to his instructions, Hiram had indorsed them; would Abram be bound? On the authority of this leading case (Fenn v. Harrison, *supra*) he would not.

But this hypothetical case is stronger in its facts than the one at bar, because Abram was not known to the bank at all, and Hiram, in his transactions with the bank, was not pretending to be doing business for his father but for himself.

LACEY, J. The appellee sued appellant in an action of trover, to recover from it the value of four promissory notes given by one Martin Teachout to Abram Ulmer, deceased, dated August 29, 1885; one for $100, payable January 1,

1887; one for $250, due January 1, 1889; one for $300, due January 1, 1890; and one for $200, due January 1, 1892, each drawing interest at the rate of eight per cent per annum payable annually. There was a plea of not guilty, and trial, verdict and judgment for appellee as administrator with the will annexed of the estate of Abram Ulmer, deceased, for the sum of $985.39 less $22 remitted, and for costs of suit. The appellant came into possession of the notes through Hiram C. Ulmer, a son of Abram Ulmer, deceased, who had the possession of the notes acquired from his father, and who hypothecated them to it to secure a certain note of his own which he had given to it.

The amount due the bank at the time the suit was commenced was about $1,600, to which the notes were pledged as collateral security.

The indorsement on the notes by Abram was in the handwriting of his son, Hiram C. Ulmer, and the main question of fact in issue in the case was whether he had authority from his father as a general or special agent to sign his name as an indorser, and to pledge the notes as security for his, Hiram's, debts, and also whether Hiram was the owner of the notes by gift from his father. There was evidence introduced by appellant to show that at various times Hiram C. had signed contracts of sale of real estate for his father and that the father had stated to various persons that his son was his agent and did all his business, and it was further in evidence that his father sent Teachout, the maker of the note, to Hiram to pay the interest, and that he stated that anything the latter did was "all right."

The appellant claims that it is in proof that at one time Hiram, by Abram's consent, pledged the notes as collateral security for a loan of Hiram. But the evidence of Slick, upon which this assumption rests, rather proves, or at least tends strongly to prove, that Slick's debt was one contracted with Abram himself for the sale of a town lot to him, and that the debt was not Hiram's. It is insisted by appellant that there was a presumption in favor of the right to indorse the notes as was done by Hiram, arising from the fact, that

if such right did not exist a crime would have been committed, and presumptions are always in favor of innocence. In a case like this we can not think such is the law. If the note was indorsed in Hiram's handwriting the burden of proof would be cast on the party claiming this right to show his authority. There does not appear to be any sufficient evidence tending to show that Hiram had the property in the notes, or that he had any general agency to indorse or negotiate the notes for his own benefit as he did in this case. Hence his act in doing so would raise a strong presumption of fraud on his part, and would justify the jury in finding the indorsement fraudulent. The general agency claimed by appellant on the part of Hiram to indorse the notes for his own benefit outside of any benefit of the father, rests on no, or very slight, evidence, and the jury were justified at least in finding there was none. The scope of the evidence seemed to be that Abram was quite old and feeble and not very well qualified to transact his own business, and that he had given the notes into Hiram's hands to keep for him and collect the interest for him, and that Hiram transacted his business generally. But it was no part of the old man's business to go security for his son's debts or allow his son without special authority to put the notes in other hands as collateral for Hiram's debts. This was not within the scope of his agency, and any one dealing for the notes in that way must show a general agency to indorse for such purpose. As, for instance, one partner of a firm may sell and dispose of the partnership property in the transaction of the partnership business but can not do so to pay the individual debts or to secure individual debts of one member of the firm without special authority from the other partners; and any one dealing for such property would not be protected without showing such agency to specially exist, or ratification afterward. The appellant in his reply brief says: "Appellant nowhere argued that we have shown an absolute gift of all his property to his son Hiram. We contended that it meant, what counsel now concedes that it meant, that everything and all of his affairs were left to be conducted by his general agent,

Hiram C. Ulmer." At most it was contended there was evidence enough to that effect on which to base an instruction. The evidence was such that it was not the province of the court to instruct the jury on any case of supposed presumption, but to leave it to the jury on the whole evidence whether any agency existed on the part of Hiram to indorse or pledge the notes as collateral security for Hiram's debts, and that the burden of proof was on the appellant to show such agency after it was shown that Abram himself, in his proper person, did not indorse or hypothecate the notes. We are satisfied that there was abundant evidence upon which the verdict can be sustained.

It is insisted by appellant's counsel that the court erred in admitting the evidence of Elizabeth Bressler, the wife of appellee and daughter and legatee of Abram Ulmer, deceased, and also in refusing to allow John L. Deets to testify on behalf of appellant. The witness Elizabeth Bressler, testified that the writing on the back of the notes of the indorsement was not .n the handwriting of her father, Abram Ulmer, deceased, and this was the extent of her evidence.

The point of her competency or incompetency as a witness is argued by counsel on either side, but we are of the opinion that under the state of the evidence it was immaterial whether she was a competent witness or not, as the fact that Hiram signed his father's name to the indorsement was not disputed. The appellee itself proved by Teachout, who was recalled as a witness for that purpose, that Abram's signature to the indorsement was in the handwriting of Hiram. It also proved by Brewer, its clerk, that Hiram deposited the notes as collateral security for a debt of his own. There was no effort to show that the name of Abram indorsed on the notes was in his proper handwriting, nor any contention at the trial that it was. So we may regard that point as undisputedly established outside the evidence of Mrs. Bressler.

We will now consider the objection made that the evidence of John L. Deets offered by appellant, was wrongfully rejected. He testified on his *voir dire* that he was the person who purchased the land sold by Abram Ulmer to Teach-

out, from the latter, and paid what he considered interest on the notes spoken of, and the subject of this suit, and had assumed to pay the notes. That he had paid interest on the notes since December, 1887, to the amount of $112. The court then ruled that Deets was incompetent as a witness. The appellant offered to show by this witness, that he asked Abram Ulmer whether it would be agreeable to him for the witness to assume the payment of the notes, and Ulmer told him to go to Hiram and any arrangement he would make would be satisfactory. The court refused the offer on the ground that Deets was interested in the event of the suit. A similar offer was made to show Abram directed him to pay the interest to Hiram, which was refused by the court; that Hiram owned the notes and he had given them to Hiram and that he looked to Hiram for support. This was likewise refused for the same reason. We see no error in the court refusing this testimony. The witness was directly interested in the event of the suit against appellee. The appellee was suing appellant to recover the value of the notes from it both in interest and principal. If he recovered, the appellant would be subrogated to the right of appellee to the notes and interest. It would acquire the same right to the notes as appellee had, because in order to recover the entire amount the appellee must show that the estate had full right to the notes and interest without abatement. Hence, if this were so, appellant, after recovery from it, would have the same right. The record of the judgment would be evidence of such right and one step in the chain of evidence of the bank in case of a suit by it to recover the full amount of the notes and interest from Deets. Deets claimed to have paid $112 interest, a portion of it after the death of Ulmer. If the payment be justified alone on the ground that Hiram was Ulmer's agent to collect such interest, the agency ceased at the death of Ulmer and the payment would not be valid. Hence as to that much of the claimed payment of interest it would not be proper to prove it because it was incompetent to establish such payment as against the administrator.

If the appellant could prove that the notes had been given

to Hiram by his father, and Hiram was the owner at the time he pledged them to the bank and at the time when the interest was paid, then, of course, all of Deets' payments would be allowed him as against appellant whether paid before or after the pledge, because, after allowing such payment there would be enough due on the notes to fully satisfy the bank's principal debt against Hiram. If the appellee should be cast in his suit Deets would be cleared from any liability over from any suit of appellant and the judgment would be in his favor to defeat any such claim and against him if in appellee's favor. It was his direct interest both to prove Hiram's agency and also his ownership of the notes, in order to defeat appellee and prevent any recovery over by appellant, on any portion of the payments made to Hiram by him. Therefore as appellee prosecuted as the administrator of a deceased person and the proposed witness being called in his own interest as well as that of appellant, the court, under the statute, properly rejected his evidence.

Objection is made by appellant to the giving of certain of appellee's instructions and error is claimed. We do not deem it necessary to go over and notice in detail these objections as it would extend this opinion to an unreasonable length.

Suffice it to say we have carefully examined those instructions and find them substantially fair to appellant and correct in law; nor do we see any substantial objection to the modification of appellant's instructions nine and ten, and besides, all of its instructions are not contained in the abstract, which should have been done if it were desired to have such objections noticed.

It appears to us that the evidence fully supports the verdict and that there is no error in the record. The judgment of the court below is therefore affirmed.

*Judgment affirmed.*